**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Roy N. Packineau, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Jo Anne B. Barnhardt, | ) | Case No. 1:06-cv-058 |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

_____

Plaintiff, Roy N. Packineau, seeks judicial review of the Social Security Commissioner's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Chief Judge Daniel L. Hovland has referred this matter to the undersigned for preliminary consideration.

I.    **BACKGROUND**

A.    **Procedural History**

Packineau protectively filed an application for disability insurance benefits and supplemental security income on February 13, 2004, alleging that he had been disabled since November 30, 2000. (Tr. 135-36).[1]  His application was denied initially and upon reconsideration, prompting him to request a hearing before an administrative law judge ("ALJ"). (Tr. 50-58, 350-57). Pursuant to his request, ALJ Warren H. Albrecht, Jr. conducted a hearing on December 15, 2005. (Tr. 358-70). At the hearing Packineau moved for an amended onset date of June 28, 2004, the date he last engaged

_____

[1]Packineau previously applied for DIB and SSI in May of 2002. (Tr. 67-70, 343-45). That claim was denied on reconsideration in October 2002. (Tr. 39-49, 346). No appeal was taken.

in substantial gainful activity. (Tr. 361).  On February 24, 2006, the ALJ issued a decision wherein he concluded that Packineau was not entitled to disability insurance benefits or supplemental security income benefits. (Tr. 16-24).

Packineau requested a review of the ALJ's decision with the Appeals Council. (Tr. 11).  On May 17, 2006, the Appeals Council denied his request for review thereby rendering the ALJ's decision as the Commissioner's final decision.  (Tr. 8).  Thereafter, on July 26, 2006, Packineau filed a complaint with this court seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1385(c).

The Commissioner filed a Motion for Summary Judgment on November 9, 2006. See Docket No. 8.  Packineau filed a reply in opposition to the motion on December 7, 2006. See Docket No. 12.  The Commissioner filed a reply brief on December 14, 2006. See Docket No. 14.

### B.    Factual Evidence

Packineau was born in November of 1964 and was thirty-nine years old at the time of the hearing before the ALJ. (Tr. 71).  He is married and lives with his wife in Bismarck, North Dakota. (Tr. 71).  The couple are the primary caregivers for their five young grandchildren. (Tr. 364).  He has a high school education. (Tr. 360).  He alleged he was disabled due to the amputation of his right leg below the knee and type 2 diabetes. (Tr. 164, 202).  Packineau lost his right leg below the knee in 1985 as the result of a motorcycle accident. (Tr. 259).  After being fitted with a prosthesis he was able to return to work. (Tr. 235).  In recent years he has had problems with his prosthesis fitting properly. (Tr. 196, 310-325).  Packineau has reported open sores on his stump and shooting pain in his left leg. (Tr. 221).  The stump irritation was reportedly caused by years of strenuous activity and heavy lifting. (Tr. 362).  Packineau's past relevant work includes heavy equipment operator,

construction laborer, asbestos abatement, and warehouse worker. (Tr. 139-147). These jobs fall in the medium to heavy exertional range. (Tr. 367). Packineau reports he was diagnosed with type 2 diabetes in late 2003. (Tr. 259). However, medical records indicate the diagnosis occurred in late 2002. (Tr. 254, 297). He has not engaged in any substantial gainful activity since June 28, 2004. (Tr. 361). He is currently attending college at United Tribes Technical College where he is studying tribal management. (Tr. 196). Packineau lives off campus and drives the one mile to school each day. (Tr. 362).

### C.    Medical Records

Packineau moved from New Mexico to North Dakota sometime between his 2002 application for SSI and DIB and his 2004 application. (Tr. 69, 71). The medical records are all from North Dakota and begin in 2003. (Tr. 310-325).

Packineau was seen at Great Plains Rehabilitation Services periodically from March 2003, through at least August of 2005, for adjustments to his prosthesis. (Tr. 310-25). Packineau was seen for a refit of his prosthesis after he complained it no longer fit properly. (Tr. 318). It was noticed that his stump had shrunk and this caused irritation so that he was not able to wear his prosthesis. (Tr. 318). Changes were made and Packineau picked up his prosthesis on August 11, 2004. (Tr. 317). It was noted that the prosthesis did fit nicely with 8-ply stump socks, Packineau was doing quite well, and the prosthesis felt very good. (Tr. 317). On August 25, 2004, an additional alteration was made to improve the fit of the prosthesis. (Tr. 316).

On April 7, 2004, Packineau presented to Dr. Paul Knudson for a consultative evaluation in connection with his claim for benefits. (Tr. 259-62). The examination was made at the request of the Social Security Administration. (Tr. 259). He reported pain at the bottom of his stump, swollen

3

feet, rashes on his right leg, and occasional shooting pains in his left leg. (Tr. 259-60).   On

examination, Dr. Knudson observed spots underneath the neoprene stocking on Packineau's right

leg, but noted that there were currently no open sores, although there had been in the past. (Tr. 260).

It was noted that Packineau had a slight limp when using his prosthesis but that he walked normally.

(Tr. 261).  Packineau does not use a cane. (Tr. 262).  He required no assistance getting out of the

chair or on and off the examination table. (Tr. 262).   He did have difficulty walking heal to toe,

squatting and getting up on his toes. (Tr. 261).  Dr. Knudson noted the diabetes was well controlled

with two medications and diet. (Tr. 262).  Dr. Knudson concluded that:

> The thing that seems to impair his mostly (sic) is pain in the stump area from his
> prosthesis.  There did not appear to be any open sores.  The skin was well maintained
> except that he had a skin reaction for the neoprene stocking that he used(,) which I
> think could be controlled either with different substance or perhaps some lotion.  I
> think jobs where he has to be constantly upright and ambulatory are going to be
> difficult for him because of the pain he feels in his prosthesis.  I think he would be
> able to do a sedentary desk job without any problem.  The limiting factor there would
> be his skills(,) for which he really does not have any skills (sic) that would lend
> themselves to employment to (sic) that type of job.

(Tr. 262).

On April 20, 2004, State agency physician T.H. Christianson, M.D., reviewed the record and

assessed Packineau's physical residual functional capacity. (Tr. 263-70).  Dr. Christianson did not

examine Packineau.  Dr. Christianson found Packineau could lift 20 pounds occasionally and 10

pounds frequently, stand and/or walk at least two hours in an eight-hour workday, and sit about six

hours in an eight-hour workday, with limited ability to push and pull with the lower extremities. (Tr.

264).  Dr. Christianson also found Packineau could never climb ladders, ropes, or scaffolds, and that

he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 265).

He also noted Packineau would need to avoid concentrated exposure to extreme heat and all

4

exposure to heights. (Tr. 267).  The doctor concluded that Packineau could perform seated light work. (Tr. 268).

On September 20, 2004, a second State agency physician reviewed the record and found Packineau could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk at least two hours in an eight-hour workday, and sit six hours in an eight-hour workday, with limited ability to push and pull with lower extremities. (Tr. 301).  The physician found Packineau could never climb ladders, ropes or scaffolds, and that he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 302).  The doctor also found Packineau should avoid even moderate exposure to extreme heat and hazards such as machinery and heights. (Tr. 304).

On October 14, 2004, Packineau saw Dr. Biron Baker at the Q&R Clinic in Bismarck with a complaint of stump irritation. (Tr. 333).  Dr Baker found Packineau had a skin ulceration on his stump that was causing the irritation. (Tr. 333).  Dr. Baker concluded, after speaking with an orthopedist, that Packineau might be able to alleviate the irritation by using extra padding. (Tr. 334). His medications were noted at this time as being Enalapril, Metformin, Micronase, Multivitamin, Ibuprofen, and "Medi grain." (Tr. 333).  Packineau is a non-smoker and non-drinker. (Tr. 333).  He returned to see Dr. Baker on December 22, 2004, regarding his diabetes but the records show no discussion of stump irritation. (Tr. 332).  He was given a new prescription for Avandamet and Enalapril to treat his diabetes and high blood pressure. (Tr. 332).  He next saw Dr. Baker on January 10, 2005, for a sore on his lower left leg that was caused by a new pair of boots. (Tr. 330).  No problems with the stump of his right leg were noted. (Tr. 330).  His diabetes was described as well controlled. (Tr. 330).

An adjustment was made to Packineau's prosthesis on June 8, 2005, after he reported problems with the fit. (Tr. 314).  It was noted that his stump had shrunk sufficiently that he need to wear 6-ply stump socks. (Tr. 314).  A new style socket was recommended. (Tr. 314).  It was noted Packineau was a very active, aggressive wearer of the prosthesis. (Tr. 314).  He returned to Great Plains Rehabilitation Services on June 17, 2006, for a check of the socket in his prosthesis. (Tr. 312). Packineau admitted he had had the prosthesis modified by another provider of prosthetics and this had been done improperly. (Tr. 312).  A new socket was needed and they were waiting for the prescription to come in. (Tr. 312).  Packineau was last seen at Great Plains Rehabilitation Services on August 30, 2006. (Tr. 310).  He was unable to leave with his new prosthesis that day as Indian Health Services (IHS) had called and denied payment that same day and Packineau apparently did not have the resources to pay for it himself. (Tr. 310).

Packineau again saw Dr. Baker on September 9, 2005, complaining of stump irritation. (Tr. 328).  Dr. Baker noted he was having difficulties with his old prosthesis and was having difficulties getting a new one. (Tr. 328).  His prosthesis had even come off at one point causing him to fall down on the sidewalk. (Tr. 328).  A small lesion was found on the stump but there were no openings in the skin. (Tr. 328).  A small skin ulceration was also found. (Tr. 328).  Dr. Baker prescribed Tegaderm dressings and gave Packineau two pieces of the material to use on the irritated area. (Tr. 329).

On October 6, 2005, Packineau saw Dr. Baker again. (Tr. 326).  It was noted that Packineau was not taking his diabetes medication, Avandamet, and that he definitely needed a prosthetic. (Tr.326).  Dr. Baker also noted Packineau was working and going to school. (Tr. 326).  Two days later on October 8, 2005, Dr. Baker completed a Medical Source Statement form in which he found

that Packineau could frequently lift less than 10 pounds, and stand and/or walk less than two hours

total in an eight-hour workday. (Tr. 339).[2]  In a letter to Packineau's representative, Dr. Baker stated

Packineau did not have good control of his diabetes. (Tr. 341).  He also reported that Packineau's

prosthesis had been largely nonfunctional over the past year or so. (Tr. 341).  Dr. Baker further noted

that Packineua would have a difficult time ambulating for any length of time due to the problems

with his stump and prosthesis. (Tr. 341).  He also reported having advised Packineau to continue

with school although this presented difficulties due to the number of stairs on campus. (Tr. 341).

### D.    ALJ Hearing

The ALJ convened an administrative hearing on December 15, 2006. (Tr. 360).  Packineau

appeared personally and was accompanied by his representative.  A vocational expert, Warren

Haagenson, was also present. (Tr. 358-70).  Packineau's representative requested an amended onset

date of June28, 2004. (Tr. 361).  The ALJ agreed to this and questioning proceeded. (Tr. 361).

Packineau testified he was having stump irritation that was affecting his ability to stand and

walk. (Tr. 361).  Packineau relayed that his doctor told him the irritation was from years of heavy

lifting that put pressure on the stump. (Tr. 362).  He had not worked in some time in order to help

with the irritation but he still got small sores on the stump. (Tr. 362).  He was taking seven hours

of college classes at United Tribes Technical College in the field of tribal management. (Tr. 362).

He drives himself to school, a distance of about one mile. (Tr. 362-63).  His studies require him do

complete homework. (Tr. 363).  He is hoping to work in tribal government or administration

someday with the Three Affiliated Tribes. (Tr. 363).  He lives with his wife and five grandchildren.

(Tr. 364).  The Packineau's have custody of their grandchildren. (Tr. 364).  The last job he had was

---

[2]The Court notes page two of this document is missing from the record.

working in asbestos abatement. (Tr. 364).  He worked in asbestos abatement until roughly June of 2004. (Tr. 365).  He has a high school education. (Tr. 367).

The vocational consultant testified the past relevant work performed by Packineau had been at the medium or heavy level. (Tr. 367).  The ALJ asked the vocational expert if a person with Packineau's abilities and limitations as summarized in the residual functional capacity report could perform any work available in the national economy. (Tr. 368).  The vocational expert testified such a person could perform a full range of sedentary level work and that there were many such jobs in the national economy. (Tr. 368).  Examples of such jobs were small parts assembly, food and beverage order clerk, and charge account clerk. (Tr. 369).

### E.   ALJ Decision

The ALJ issued his written opinion denying Packineau's application for disability insurance benefits on February 24, 2006. (Tr. 16-24).  When reviewing the application, he employed the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520.  He quickly dispensed with the first step, acknowledging that Packineau had not engaged in any substantial gainful activity since the alleged onset date of his disability, June 28, 2004.  (Tr. 19).

At the second step, the ALJ inquired into whether Packineau had a severe impairment. Packineau claimed a severe impairment arising from stump irritation and type 2 diabetes. (Tr. 164, 202).  Packineau lost his right leg below the knee in 1985 as the result of a motorcycle accident. (Tr. 259).  The ALJ determined Packineau's below the knee amputation did constitute a severe impairment. (Tr. 19).  However, the ALJ also found that Packineau's diabetes did not constitute a severe impairment. (Tr. 18).  The ALJ explained that there was no evidence that Packineau's

8

diabetes caused any functional limitations as long as he was compliant with his medications and diet. (Tr. 20).

Moving on to the third step of his analysis, the ALJ compared Packineau's impairment to the presumptively disabling impairments listed 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 20). In so doing, he determined that Packineau did not have an impairment or combination of impairments that arose to listing level severity, concluding that there was no evidence Packineau's stump irritation caused a medical inability to use a prosthetic or walk. (Tr. 20).

At the fourth step, the ALJ assessed Packineau's residual functional capacity, that is his "ability to do physical or mental work activities on a sustained basis despite limitations from his impairments." (Tr. 18). The ALJ agreed that Packineau's amputation could reasonably be expected to produce the problems complained of. (Tr. 21). These include sores and irritation on the stump that affect his ability to stand and walk and excessive pain in the stump while walking with the likely cause being years of heavy exertional work following the amputation. (Tr. 20). However, the ALJ concluded Packineau's statements regarding the severity, length, and limiting effects of the symptoms were not entirely credible. (Tr. 21). In so finding the ALJ noted the stump irritation was caused by an ill-fitting prosthesis and that insurance problems had prevented Packineau from obtaining a prosthesis that fit properly. (Tr. 21). The ALJ also noted that Packineau was attending school, tending to his own needs, and had been let go from his last job due to a disagreement with his boss rather than any functional limitations. (Tr. 21).

The ALJ afforded significant weight to the State agency physician's assessment of Packineau's residual functional capacity:  that Packineau was capable of performing sedentary to light work, with standing or walking two hours in an eight hour day and sitting six hours in an eight

hour day along with occasional climbing, balancing, stooping, kneeling, crouching, and/or crawling and avoidance of concentrated exposure to hazards such as machinery or heights. (Tr. 21). The ALJ concluded this assessment was well supported by and consistent with the record as whole. (Tr. 21).

The ALJ afforded only minimal weight the residual functional capacity assessment of Packineau's treating physician, Dr. Baker, who found Packineau could carry or lift less than ten pounds and walk or stand less than two hours in an eight hour day. (Tr. 21). The ALJ explained that Dr. Baker's opinion found these limitations were due to Packineau's ill-controlled diabetes and a non-functioning prosthesis. (Tr. 21). The ALJ noted the problem with the prosthesis was caused by insurance problems and an improper alteration of the old prosthesis and the poor control of the diabetes was caused by a failure to comply with the prescribed medication regimen. (Tr. 21-22).

Continuing on to the second stage of the fourth step the ALJ accepted the opinion of the vocational expert that Packineau could not return to his past relevant work. (Tr. 22). Packineau's past relevant work was that of a heavy equipment operator and hazardous material technician. (Tr. 22). These jobs are considered medium to heavy exertional work and thus Packineau would be exertionally precluded from returning to them. (Tr. 22).

Since Packineau's impairments prevented him from performing his past work, the burden at the fifth step shifted to the Commissioner to determine whether there were jobs existing in significant numbers in the national economy that he was capable of performing. (Tr. 18). Relying upon the testimony of the vocational expert, the ALJ found that Packineau's functional limitations allowed him to perform sedentary work and there existed in the national economy a significant number of jobs that he could perform consistent with his age, education, work history, and residual functional capacity. (Tr. 23). These jobs included manual small parts assembler, beverage order

clerk, and charge account clerk. (Tr. 23).  Consequently, the ALJ concluded that Packineau was not disabled as defined in the Social Security Act.  (Tr. 23).

## II.   LEGAL DISCUSSION

### A.   Standard of review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review.  Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d 988,  993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results.  Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal."  Id.  Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion.  Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999);

Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993). The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.

### B.    Law governing eligibility for adult benefits

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act"). 42 U.S.C. § 423(a)(1)(D). To meet this burden, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment. 42 U.S.C. § 423(d)(1)(A)." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the claimant would be hired if he or she applied for work. 42 U.S.C. § 423(d)(2)(A). Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id.

In deciding whether a claimant is disabled within the meaning of the Act,  the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1)     whether the claimant is presently engaged in a substantial gainful activity,

(2)     whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)     whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)     whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)     if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations.  20 C.F.R. § 404.1545.  The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations.  Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions."  Id.  In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[3]  E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005).  Claimant's

---

[3]  In Polaski, the Eighth Circuit approved a settlement agreement with the Secretary of HHS that contained, in part, the following language, which the court stated was a correct statement of the law with respect to the manner in which subjective pain complaints are to be analyzed:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the

subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole.  Pearsall v. Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that are supported by accepted diagnostic techniques and that are not inconsistent with other substantial evidence.  This rule does not apply, however, to opinions regarding disability or inability to work because these determinations are within the exclusive province of the Commissioner.  The Eighth Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. See Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir.2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. See Stormo [v. Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).
> . . . .
> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and

---

objective medical evidence does not fully support them.

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>   1. the claimant's daily activities;
>   2. the duration, frequency and intensity of the pain;
>   3. precipitating and aggravating factors;
>   4. dosage, effectiveness and side effects of medication; and
>   5. functional restrictions.
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. [Emphasis in original.].

739 F.2d at 1322.  The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

Ellis v. Barnhart, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner. The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law. 20 C.F.R. § 404.1504. E.g., Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996). And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Pearsall v. Massanari, 274 F.3d at 1217.

### C.     Analysis and Discussion

The Commissioner makes three arguments in support of her motion for summary judgment: (1) the decision of the ALJ was supported by substantial evidence; (2) the ALJ properly determined that Packineau had the ability to perform sedentary work; and (3) proper weight was given to the medical opinions contained in the record. In his brief, Packineau argues that the ALJ's decision is not supported by substantial evidence as the question asked of the vocational expert was improper and that Packineau meets the listing at 20 C.F.R. Pt. 404, Subpt. P, App.1.05(B).

### 1.     Listing Level Impairment

Packineau alleges that the below the knee amputation of his right leg along with his stump irritation meets the requirements of Listing 1.05, set forth at 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.05. A listing-level impairment is one which is presumptively disabling without consideration of the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(d). The burden is on the

claimant to show he or she has a listing-level impairment. Johnson v. Barnhart, 390 F.3d 1067, 1070

(8th Cir. 2004).

The pertinent portion of Listing 1.05 is set forth below.

1.05 Amputation (due to any cause).

B. One or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b, which have lasted or are expected to last for at least 12 months;

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.05.

"Inability to ambulate effectively" is defined as follows.

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B(2)(b).

Packinea has not established that he cannot ambulate effectively with his current prosthesis.

The record establishes that he can travel without assistance and that he does so on a regular basis

when he travels to United Tribes Technical College to attend classes. (Tr. 363).  There is no

16

evidence in the record that Packineau uses any sort of hand-held assistive devices such as a cane, walker, or crutch to help him walk.   In April 2004, he was evaluated by a physician for the Commissioner. (Tr. 259-62).  He was found to have a slight limp but he could walk normally. (Tr. 261).  His gait was not wide based or ataxic although he had difficulty walking heel to toe. (Tr. 261).  It was noted he did not use a cane and he reported he never used one to walk. (Tr. 262).  He was unable to get into a squatting position because of his prosthesis, but he was able to get out of his chair and onto the examination table without any assistance. (Tr. 261-62).  The records from Great Plains Rehabilitation Services dated June 8, 2005, state he is a "very active, aggressive wearer" of his prosthesis. (Tr. 314).  On September 6, 2005, Dr. Baker saw Packineau and noted he had recently fallen because of an ill-fitting prosthesis. (Tr. 328).  When Packineau was seen again on October 6, 2005, it was noted he was working and going to school despite needing a new prosthesis. (Tr.326-28).  The opinion of Dr. Baker that Packineau would have a great deal of difficulty ambulating is contradicted by his own treatment records. (Tr. 326-28, 341).  The letter by Dr. Baker in which he offers this opinion is dated November 8, 2005, and is addressed to Packineau's representative. (Tr. 341).  As this opinion is not supported by or consistent with the medical records it need not be given controlling weight. Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004).

It is certainly true that Packineau would benefit from a new prosthesis.  However, the record simply does not support Packineau's argument that his impairment is of listing-level severity.  The record does demonstrate that, even with his ill-fitting prosthesis, Packineau is able to ambulate effectively.  This is demonstrated by his ability to drive a car and go to school and by the fact that he does not use any sort of assistive device to help him walk.

### 2.    Substantial Evidence

17

The ALJ acknowledged in his decision that Packineau, in his current condition and without a new prosthesis, could not perform his past relevant work which involved heavy labor. (Tr. 21). However, the ALJ concluded that the record as a whole demonstrated Packineau could perform sedentary work despite his impairments and need for a new prosthesis. (Tr. 21).

Packineau argues that he is unable to perform sedentary work with ill-fitting prosthesis, that he needs a new prosthesis, that he cannot afford to purchase the new prosthesis, and that IHS will not provide him with a new prosthesis.[4]   He does not suggest that he would not be able to perform sedentary work if he had a better fitting prosthesis.   Packineau claims the hypothetical question posed to the vocational expert was improper as it referred to a residual functional capacity report that did not consider his ill-fitting prosthesis.   He cites to a letter from Dr. Baker to Packineau's representative dated November 8, 2005, and a Medical Source Statement form completed by Dr. Baker on that same day in support of his argument. (Tr. 339-341).   In the letter Dr. Baker opines that Packineau's prosthesis has been largely non-functional for the last year. (Tr. 341).   However,  the medical records kept by Dr. Baker regarding Packineau do not support this conclusion.   On October 10, 2004, Packineau was seen for stump irritation and for his diabetes. (Tr. 333).   The irritation was treated with a Tegaderm dressing and he was referred to Hangar Orthotics. (Tr. 334).   He was next seen on December 22, 2004, and no made no complaint regarding his prosthesis. (Tr. 332).   On January 10, 2005, he was seen for a sore on his left leg but no complaint was made regarding right leg stump or prosthesis. (Tr. 330).   Dr. Baker noted that Packineau's diabetes was well controlled.   His next visit with Dr. Baker was eight months later on September 6, 2005. (Tr. 328).   He complained of stump irritation and that he was having a hard time getting a new prosthesis. (Tr.

---

[4]The record does not establish how much a new prosthesis would cost or why IHS refused payment.

18

328).  He also reported having fallen on one occasion. (Tr. 328).  He was again given Tegaderm

dressings and prescription for more Tegaderm dressings if necessary with a notation that this remedy

had worked in the past. (Tr. 329).  When Packineau was seen by Dr. Baker on October 6, 2005, it

was noted he was working and going to school despite needing a new prosthesis. (Tr.326-28).  In

addition Packineau was attending school at a technical college which required him to do homework

and he was driving himself to school. (Tr. 363).  Dr. Baker encouraged him to continue his studies.

(Tr. 341).  These records simply do not establish that Packineau's prosthesis was "largely

nonfunctional over the past year or so" as Dr. Baker concluded in his November 8, 2005, letter.  Nor

does the record support the degree of  functional limitations noted by Dr. Baker in the Medical

Source Statement. (Tr. 339).  The records do show a man who was having some problems with

stump irritation but was getting along and going to school.  Dr. Baker's records alone provide

substantial evidence to support the ALJ's conclusions.

> In his hypothetical question to the vocational expert the ALJ stated as follows:
>
> We have a gentleman of this person's age, education level, and past work experience
> who has incurred a crush limb injury in a motorcycle accident requiring a BK
> amputation as it's called just below the knee.  He also has diabetes.  It appears the
> diabetes is under control.  The – he continued to do some work after the amputation
> was healed up and after they placed a prosthesis with him and now he has stump
> irritation and has had that for a couple of years and has been seen and treated for that.
> The District Office has changed his – the view they have of his residual functional
> capacity and they have suggested he is capable of and let's assume for the moment
> this first hypothetical that he's capable of lifting and carrying up to 20 pounds with
> – on an occasional basis.  he would be able to be on his – up and about on his feet
> standing or moving around for two hours, up to two hours in an eight hour work day
> with the rest being in a sitting position.  He has unlimited use of his upper
> extremities so this would be a somewhat limited range of the light area or it could be
> seen as sedentary, the full range of sedentary.  Now if that were the residual, actual
> residual functional capacity would there be jobs in the national economy he could
> perform?

(Tr. 367-68).  The vocational expert found that such a person could perform a full range of sedentary

jobs. (Tr. 368).  Sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally
> lifting or carrying articles like docket files, ledgers, and small tools.  Although a
> sedentary job is defined as one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job duties.  Jobs are sedentary if
> walking and standing are required occasionally and other sedentary criteria are met.

C.F.R. § 404.1567(a).

The functional limitations established by the state agency physician and incorporated into

the ALJ's hypothetical question to the vocational expert clearly meet the definition of sedentary

work.  There is no dispute that Packineau's impairments do not limit his ability to use his upper

extremities in any way. (Tr. 303, 341).  The state agency physician concluded Packineau would be

able to perform sedentary desk job. (Tr. 262).  The question asked by the ALJ contemplated

Packineau's stump irritation and included the functional limitations which the Court has determined

were supported by substantial evidence.  As such, the Court finds nothing improper with the

hypothetical question posed by the ALJ.

### 3.    Medical Opinions

The Court has already discussed the medical opinions regarding Packineau's stump irritation

and will not plow the same ground here.  Although not specifically addressed by Packineau in his

brief the court will his address his type 2 diabetes.

The ALJ and the state agency physician both concluded that Packineau's diabetes was well

controlled with oral medication and diet. (Tr. 22, 262).  Dr. Baker stated in his November 8, 2005,

opinion letter that Packineau's diabetes was not well controlled. (Tr. 341).  However, his treatment

notes do not support this conclusion.  On October 14, 2004, it was noted Packineau had had type2

diabetes for two years. (Tr. 333).  On January 10, 2005, Dr. Baker noted that Packineau's diabetes

was well controlled. (Tr. 330).  On October 6, 2005, it was noted he was not taking his diabetes

medication every day as had been prescribed. (Tr. 326).  There are no treatment notes from Dr.

Baker that describe Packineau's diabetes as not being well controlled.  Thus, Dr. Baker's conclusion

in this regard is unsupported by the record and need not be given controlling weight. Stormo v.

Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004).

## III.   CONCLUSION AND RECOMMENDATION

Based on the foregoing, it is hereby **RECOMMENDED** that the Commissioner's motion

for summary judgment (Docket No. 8) be granted and that this matter be dismissed.

### NOTICE OF RIGHT TO FILE OBJECTIONS

Pursuant to Local Rule 72.1(E)(4), any party may object to this recommendation within ten

(10) days after being served with a copy of this Report and Recommendation.

Dated this 3rd day of January, 2007.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge